UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PRESCOTT MCCURDY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00511-LEW |
| | ) | |
| STATE OF MAINE, | ) | |
| | ) | |
| Respondent | ) | |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

Petitioner, pursuant to 28 U.S.C. § 2254, seeks relief from a state court conviction

and sentence.  (Petition, ECF No. 1.)  Petitioner argues that his trial lacked due process and

that the statutes underlying his convictions and sentence for violating a protection from

abuse order unconstitutionally restrict speech.  (Petition at 6–9.)  The State asks the Court

to dismiss the petition.  (Answer, ECF No. 4.)

After a review of the section 2254 petition, the State's request for dismissal, and the

record, I recommend the Court grant the State's request and dismiss the petition.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**A.      The Parties and Court Orders**

Petitioner and Jenny Burch had a romantic relationship that lasted between one year

and eighteen months; they had a son, C.B., who was born in 2012.  (*State v. McCurdy*, Me.

Super. Ct., SAGCD-CR-2017-00013, Tr. Day 1 at 109, 173–74; Tr. Day 2 at 55–56.)  In

2013, a state court entered a two-year protection from abuse order that (1) prohibited

Petitioner from threatening, assaulting, molesting, attacking, harassing, or otherwise

abusing Burch and any minor children residing in her household and (2) prohibited Petitioner from having any direct or indirect contact with Burch, except direct e-mail contact concerning C.B. (Tr. Day 2 at 119; *see also*, 19-A M.R.S. § 4001 *et seq.*.)[1]

While the original protection from abuse order was in effect, Petitioner commenced an action for parental rights and responsibilities. (*Id.* at 119–20.) A state court subsequently entered a parental rights and responsibilities order that provided Petitioner would have contact with C.B. three days per week, with two of the days to be consecutive and include one overnight each week. (Tr. Day 1 at 142, 218–19; Tr. Day 2 at 69.) The parental rights and responsibilities order directed Petitioner to email Burch each Friday to notify her of Petitioner's contact days for the following week. (Tr. Day 1 at 142.)

In July 2015, the state court extended the protection from abuse order for two more years. (Tr. Day 1 at 110; ECF No. 8-1.) In the summer and fall of 2016, Petitioner sent Burch a number of communications purporting to be legal documents; the communications were the bases for the criminal proceedings Petitioner challenges in this action.

## B. The Communications

On June 19, 2016, Petitioner sent Burch an email containing two attachments. In the email, Petitioner wrote, "the attachments contain documents I filed with the court and other places last week. If you desire notarized copies, you can acquire them at the court house." (Tr. Day 1 at 112–14; ECF No. 8-2 at 6.) The first document was captioned "CONSTRUCTIVE NOTICE, INTENT, AND CLAIM OF RIGHT," the second document

---

[1] The grounds and procedural history for the original protection from abuse order were not made part of the trial record.

was captioned "JUDICIAL NOTICE," and both were addressed to Maine's Attorney General and the state court judge who issued the protection from abuse order. (Tr. Day 1 at 114–15; ECF Nos. 8-2, 8-3). The Constructive Notice was five pages, included many legal terms, alleged the judge had committed "malfeasance," "transgression," and "tort" against Petitioner, described judge's oath of office and code of conduct, claimed the custody order exhibited bias and was illegal, argued that both parents have the right to an equal relationship and amount of time with their child, and declared that the custody order was "null and void." (ECF No. 8-2.) The Judicial Notice contained five pages of citations and quotations from authorities generally describing the duties of government officials and various fundamental rights of citizens. (ECF No. 8-3.)

On Friday, June 25, 2016, Petitioner sent Burch an email stating, "my schedule with [C.B.] will continue to be Mondays, Thursdays, and Fridays, with one change, [C.B.] will be staying overnight all those days. On Tuesday morning I will drop [C.B.] off at daycare by 9am. On Saturday, [C.B] will be available for pickup at my sister at 9:00 am." Petitioner continued, "If there are other alternatives you wish to discuss pleas [sic] do so." (Tr. Day 1 at 118–19; ECF No. 8-4.)

On July 7, 2016, Burch received an instant message from a friend informing her that Petitioner had published an ad in the Coastal Journal, a local newspaper. (Tr. Day 1 at 120.) Burch obtained the newspaper and found a private place to review it because she was "pretty shook up about thinking what might be in the Coastal Journal." (Tr. Day 1 at 120–21.) On the back page of the newspaper was a copy of the Constructive Notice that Petitioner had previously emailed to Burch on June 19. (ECF No. 8-5.)

In August 2016, a Cumberland County Sheriff's Deputy served a document on Burch while she was at work captioned "NOTICE AND DEMAND." (Tr. Day 1 at 122.) Burch also received the same document in the mail and via email on about the same date. (Tr. Day 1 at 122–23.) The document characterized Petitioner's prior communications as "opportunit[ies] to discuss parent rights agreements" to which Burch allegedly "chose to forgo discussion on all occurrences." (ECF No. 8-6 at 1.) The document described an incident on June 26 in which Burch allegedly prevented Petitioner from picking up C.B. at daycare and called for police assistance, which led to a protection from abuse action that was dismissed in July 2016. (*Id.* at 1–2.) The document implied that Burch provided perjured testimony about an alleged 2013 assault which led to the original protection from abuse order and demanded that Burch cease and desist "trespassing" against Petitioner's parental rights. (*Id.* at 2.) Petitioner demanded that Burch begin a discussion of a fair and equal custody agreement and claimed that if Burch failed to respond within fifteen days, she was tacitly agreeing to certain terms, including that Petitioner could determine the custody arrangement. (*Id.* at 2–3.)

On September 14, 2016, the Board of Overseers of the Bar received a letter from Petitioner "to inform you of some of the actions that one of your members has been performing." (ECF No. 8-7 at 2.) Petitioner attached a copy of the same Notice and Demand document that he had served and sent to Burch in August. (*Id.* at 3–6.) On September 19, 2016, Burch received a copy of the documents from the Board in her law

office mail, including a copy of a letter the Board sent to Petitioner dated September 16, 2016 responding to his complaint.  (Tr. Day 1 at 123–32.)[2]

On Saturday, September 24, 2016, Petitioner sent an email to Burch.  (ECF No. 8-8.)  The body of the message said:

> for now, the schedule for [C.B.] and I will continue to be Monday, Thursdays and Fridays.  Each day that [C.B.] is with me will be a 24 hour day.  I will take [C.B.] to daycare on Tuesday morning.  Saturday, you can pick up [C.B.] at my sisters around 9:15 am.  this will allow for space between drop off and pick up.
>
> I will begin to pay daycare for one day a week starting October.

(*Id.*)  The email also contained an attachment captioned "NOTICE OF DEFAULT," which stated, "the lack of response to the NOTICE AND DEMAND you received on August 18, 2016, indicates acquiescence."[3]  (ECF No. 8-9.; Tr. Day 1 at 133–34.)  Petitioner also mailed to Burch the same Notice of Default document signed with a signature and a fingerprint stamp.  (ECF No. 8-10; Tr. Day 1 at 135.)

In the middle of October 2016, Burch received additional documents via mail, email, and hand delivery by a sheriff's deputy, several portions of which documents were signed by Petitioner with a signature and a stamped fingerprint.  (Tr. Day 1 at 136–38.)  A one-page document captioned "NOTICE OF CLAIM" said, "This Notice is to Notify you that a Claim has been filed against you at Maine District Court in West Bath" and suggested that Petitioner filed the claim in response to two recent protection from abuse actions.  (ECF

---

[2] Later, at trial, the Court admitted this communication into evidence only for purposes of the stalking charge, not for purposes of the charges that Petitioner violated the protection from abuse order because the Board, rather than Petitioner, sent the documents to Burch.  (*Id.*)

[3] The email contained two attachments, the new Notice of Default document and the Notice and Demand from August to which the new document referred.

No. 8-11.)  Petitioner attached to the Notice of Claim a copy of a six-page complaint and affidavit filed with the West Bath District Court captioned:

| | | |
|---|---|---|
| i: a man; | ) | Nature of Case: Claim |
| *prosecutor* | ) | |
| | ) | |
| _____ | ) | claim: trespass, |
| | ) | trespass on the case |
| Jenny Burch, a (wo)man; | ) | (Malicious Prosecution, Abuse of Process), |
| *Wrongdoer* | ) | perjury |

(ECF No. 8-12 at 1.)  The document summarized Petitioner's prior communications to Burch during the summer of 2016 and described incidents that occurred in late June, late September, and early October in which Petitioner expected to pick up C.B. at daycare but was prevented from doing so.  (*Id.* at 2–5.)  Petitioner alleged that two of the incidents led to new protection from abuse proceedings, one of which was dismissed and one of which resulted in a protection from abuse order on C.B.'s behalf. (*Id.*)  Petitioner alleged that Burch committed perjury during the proceedings and Petitioner apparently viewed each of the incidents as a "trespass" either on "the case"[4] or on his "property," which presumably referred to C.B.  (*Id.*)  Petitioner claimed that he was owed compensation from Burch as a result.  (*Id.*)

Petitioner had also attached a document captioned "NOTICE" that was addressed to the state court judge who issued the recent order and the Maine Attorney General.  (ECF No. 8-13.)  The document challenged many of the judge's findings in the most recent protection from abuse proceeding and referred to Petitioner's parental rights as his

---

[4] "The common-law action of trespass on the case (or simply case) may be regarded as the ancestor of the modern tort action based on negligence."  1 Am. Jur. 2d Actions § 18.  The action historically provided relief for injuries that were inflicted indirectly or did not involve a willful and deliberate act.  *Id.*

"property" that had allegedly been taken without compensation. (*Id.* at 1–2.) Petitioner demanded that within three days, the 2016 protection from abuse order be voided and that the judge recuse herself from further cases involving Petitioner; Petitioner claimed $6,000 per day in compensation for each day that his demands were not met. (*Id.* at 3.)

In late October 2016, Burch was served with a copy of two documents that Petitioner had sent to the West Bath District Court; one was an invoice and the other was captioned "NOTICE." (Day 1. Tr. at 139–40; ECF No. 8-14 at 1, 3.) The Notice stated that Petitioner required compensation of $3,000 per day for complying with the 2016 protection from abuse order until it is voided, $1,000 per day for complying with the custody order, and $25 per day for complying with the original 2013 protection from abuse order, which was extended in 2015. (ECF No. 8-14 at 1.) The invoice purported to bill Burch for $69,000 based on Petitioner's proposed $3,000 per day since October 3. (*Id.* at 2.)

## C. Criminal Proceedings

In January 2017, Petitioner was charged with six counts of violating a protection from abuse order in violation of 19-A M.R.S. § 4011(1) and one count of domestic violence stalking in violation of 17-A M.R.S. § 210-C(1)(A). (*State v. McCurdy*, Me. Super. Ct., No. SAGCD-CR-2017-00013, Docket Record at 1; Complaint at 1–3.) Each of the six charges for violating a protection from abuse order was based on a different date between June and October 2016. (Complaint at 1–3.) A trial was held on May 11, 2017. (Docket Record at 3–4.)

At trial, Burch testified that the communications took considerable time out of her work days and were "incredibly stressful and draining" for her. (Tr. Day 1 at 140–43.)

Burch found the documents to be "whacky" because they were unlike the sort of court filings to which she was accustomed, and she "thought it was scary that he was declaring the custody order null and void." (Tr. Day 1 at 190.) Burch testified that she felt terror that Petitioner was attacking the family matter years afterward. (*Id.* at 192–94.)

Petitioner testified that he was instructed by attorneys and judges that he should send copies of documents to any parties in a case; Petitioner said he expected responses from the attorney general and other officials and had copied Burch because he believed she was involved in the matters. (Tr. Day 2 at 79–84, 120–21.) Petitioner characterized his notices as attempts to discuss with Burch getting more time with C.B. or alternative arrangements. (*Id.* at 89–93.) Petitioner claimed that he attempted to protect his rights and did not intend to harass or intimidate Burch. (*Id.* at 92–94, 100, 143–44.) Petitioner also highlighted other email communications between Burch and Petitioner during 2015 and 2016 in which the two parents respectfully coordinated arrangements for C.B., and Petitioner stressed that he believed he acted peacefully and never made any threats to anyone. (Tr. Day 1 at 158–59; Defense Exhibit 1, ECF No. 8-15; Tr. Day 2 at 109–10.) On cross-examination, Petitioner admitted that he could understand why someone might find the communications regarding parental rights and responsibilities alarming. (Tr. Day 2 at 125, 129, 131,)

The State dismissed count two. (Docket Record at 3.) Upon a motion for judgment of acquittal, the trial court dismissed count three. (Docket Record at 4.) The jury was hung

on counts one, five, and seven, the stalking charge.[5]  (*Id.*; Tr. Day 2 at 251–53.)  On the counts four and six, which corresponded to communications that occurred on or about September 24 and October 25, the jury returned guilty verdicts.  (*Id.*)

In June 2017, the trial court sentenced Petitioner to a 120-day term of imprisonment, with all but 7-days suspended, to be followed by one year of administrative release, but the trial court stayed execution of the sentence pending appeal.  (*Id.* at 6.)  In February 2018, the Maine Law Court affirmed the conviction.  (*State v. McCurdy*, Me. L. Ct., No. SAG-17-229, Memorandum of Decision at 1.)

In March 2018, Petitioner filed a state postconviction petition.  (*McCurdy v. State*, Me. Super. Ct., No. SAGCD-CR-2018-00187, Docket Record at 1.)  The state court denied the petition without a hearing in February 2019, and the stay of execution of the sentence was lifted at the end of March 2019.  (*Id.*; Postconviction Decision at 1.)  On October 28, 2019, Petitioner signed the § 2254 petition with this Court.  (ECF No. 1.)

## DISCUSSION

### A.    Legal Standards

Pursuant to 28 U.S.C. § 2254(a), a person in custody pursuant to the judgment of a state court may apply to a federal district court for writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

Absent circumstances not relevant to Petitioner's case, a petitioner is required to exhaust available state court remedies before he seeks federal habeas review.  28 U.S.C.

---

[5] The State later dismissed the three charges.  (*Id.* at 5.)

§ 2254(b), (c).[6] "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry,* 513 U.S. 364, 365 (1995) (per curiam)) (quotation marks omitted). In *Baldwin,* the Court noted that "[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (quoting *Duncan,* 513 U.S. at 365–66).

---

[6] Title 28 U.S.C. § 2254(b) and (c) address exhaustion and state:

> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
>> **(A)** the applicant has exhausted the remedies available in the courts of the State; or
>>
>> **(B) (i)** there is an absence of available State corrective process; or
>>
>> **(ii)** circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> **(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
>
> **(3)** A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.
>
> **(c)** An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

To exhaust a claim fully in state court in Maine, a petitioner must request discretionary review by the Law Court. *See* 15 M.R.S. § 2131. The Supreme Court has held that a procedural default bars federal review absent a demonstration of cause for the default and prejudice to the petitioner:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[7]

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court recognized a "narrow exception" to its holding in *Coleman*, based on equity, not constitutional law: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9, 16. However, when the procedural default relates to post-conviction counsel's actions at the discretionary-review stage rather than at the initial-review stage of the collateral proceedings, habeas relief is not available:

> The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . .

---

[7] Procedural default is a judicial doctrine "related to the statutory requirement that a habeas petitioner must exhaust any available state-court remedies before bringing a federal petition." *Lovins v. Parker,* 712 F.3d 283, 294 (6th Cir. 2013) (citing 28 U.S.C. § 2254(b), (c)).

*Martinez*, 566 U.S. at 16 (citations omitted).

As to federal habeas claims that were adjudicated on the merits in state court, the federal court may not grant relief unless (1) the state court decision was contrary to, or an unreasonable application of, federal law, as determined by the Supreme Court, pursuant to 28 U.S.C. § 2254(d)(1); or (2) the decision was based on an unreasonable determination of the facts, pursuant to section 2254(d)(2).[8]

As to review of a state court decision under section 2254(d)(1), "[i]t is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" *Nevada v. Jackson,* 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter,* 562 U.S. 86, 102 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the [*Strickland v. Washington*, 466 U.S. 668 (1984)] standard itself." *Harrington*, 562 U.S. at 101. Claims of ineffective assistance of counsel are thus subject to a "'doubly deferential'" standard of review, in deference to both the state court and defense counsel. *Woods v. Etherton,* --- U.S. ---, ---, 136 S. Ct. 1149, 1151

_____

[8] Title 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim−
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(2016) (per curiam) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). State court

determinations of fact "shall be presumed to be correct," and "[t]he applicant shall have

the burden of rebutting the presumption of correctness by clear and convincing evidence."

28 U.S.C. § 2254(e)(1).[9]

In *Strickland*, the Supreme Court set forth the relevant Sixth Amendment standard

by which claims of ineffective assistance based on counsel's errors are evaluated on the

merits; *Strickland* requires a petitioner to demonstrate that "counsel's representation fell

below an objective standard of reasonableness," and that "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in

the outcome." *Strickland*, 466 U.S. at 688, 694. A court need not "address both

components of the inquiry if the defendant makes an insufficient showing on one." *Id.*

at 697. A court presumes "that counsel has 'rendered adequate assistance and made all

---

[9] The decisions under review in this case are the Law Court's orders affirming the decisions of the trial court, because the Law Court's decision is the final state court adjudication on the merits of each claim. *See Greene v. Fisher*, 565 U.S. 34, 40 (2011) (noting that the last state-court adjudication on the merits of the petitioner's constitutional claim occurred on direct appeal to the state's supreme court); *Clements v. Clark*, 592 F.3d 45, 52 (1st Cir. 2010) ("A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'") (quoting *Teti v. Bender*, 507 F.3d 50, 56-57 (1st Cir. 2007)).

However, because the Law Court's postconviction order did not explain the Court's reasoning for denying a certificate of probable cause, the federal court may consider the trial court's decision for those claims:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (noting the state may rebut the presumption).

significant decisions in the exercise of reasonable professional judgment.'" *Companonio v. O'Brien*, 672 F.3d 101, 110 (1st Cir. 2012) (quoting *Strickland*, 466 U.S. at 690).

A court considers "the totality of the evidence," and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

## B.    First Amendment Claims

### 1.    Free Speech

The relevant portion of the First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble. . . ." U.S. Const. amend. I. Petitioner argues that Maine's statutes underlying his prosecution and conviction are overbroad and vague speech restrictions[10] and were unconstitutionally applied in his case. Petitioner contends that his communications did not contain any threats.

---

[10] In First Amendment cases, "[t]he overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit any criminal law "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). Regardless of whether a statute is void for vagueness under the due process clauses, when a speech regulation is poorly defined, "[t]he vagueness of . . . a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871–72 (1997). In the First Amendment context, the two doctrines permit a defendant "to raise [a statute's] vagueness or unconstitutional overbreadth as applied to others" even when a statute is not "otherwise invalid as applied to the conduct charged against a particular defendant . . . ." *Gooding v. Wilson*, 405 U.S. 518, 521 (1972).

The First Amendment provides varying levels of protection against different types of government restrictions on speech or expressive conduct in a public forum. Content-neutral laws, such as "time, place, or manner" restrictions are "justified without reference to the content of the regulated speech" and are constitutional as long as "they are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). A viewpoint-based law "targets not subject matter, but particular views taken by speakers on a subject," which represents a "blatant" violation of the First Amendment from which "the government must abstain. . . ." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995); *see also*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (if a restriction "is viewpoint-based, it is unconstitutional").

Petitioner notes that because 19-A M.R.S. § 4011(1) criminalizes violations of a protective order, the statute incorporates the terms of the state court's protective order, which in his case involved a prohibition on "harassing or otherwise abusing" Burch and restricted any contact with her to emails concerning [C.B.] While the term "abuse" is defined to involve bodily injury, fear of bodily injury, force, threat of force or intimidation, and other specific conduct, 19-A M.R.S. § 4002(1), the jury was not instructed on the

definition of "abuse" and "harass" is not defined in the statute.[11]  The state's restrictions appear to be content-based, which would trigger strict scrutiny analysis.  On direct appeal and postconviction review, the state court rejected Petitioner's First Amendment challenge based on the conclusion that harassment is not protected under the First Amendment. (Direct Appeal Decision at 1, Postconviction Decision at 1.)  For that reason, Maine courts generally uphold protection from abuse orders, which would otherwise be carefully scrutinized prior restraints on speech.  *See Childs v. Ballou*, 2016 ME 142, ¶¶ 17–22, 148 A.3d 291, 296–98.

The Supreme Court has recognized a greater authority for the government to make content-based restrictions on speech "when confined to [a] few historic and traditional categories," including incitement, obscenity, defamation, speech integral to criminal conduct, so-called fighting words, child pornography, fraud, true threats, and speech presenting some grave and imminent threat the government has the power to prevent. *United States v. Alvarez*, 567 U.S. 709 (2012).  The Supreme Court has narrowly confined those categories, however, and other courts have concluded, "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause," and "[s]uch a categorical rule . . . belies the very real tension between anti-harassment laws and the Constitution's guarantee of freedom of speech."  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.).

---

[11] "Harassment" is somewhat circularly defined in another criminal statute as "without reasonable cause" engaging in "any course of conduct with the intent to harass, torment or threaten another person" after having been notified not to do so by a public official.  17-A M.R.S. § 506-A-1(A)(1).

The Supreme Court, however, has suggested that some forms of speech typically considered harassment may be proscribed consistently with the First Amendment. In *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 730 (1970), the Supreme Court upheld a federal statute requiring mailers to stop future mailings to a household after a recipient notified the Postmaster General that the recipient had received certain advertisements and wished for the sender to refrain from sending more to the named addressee. The *Rowan* Court "categorically reject[ed] the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another," *id.* at 738, reasoning that "the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings from that mailer." *Id.* at 737. Conversely, in *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419–20 (1971), the Supreme Court struck down an injunction in favor of a plaintiff seeking to stop defendants from sending to other people pamphlets critical of Plaintiff's business tactics.

Although the Supreme Court has never squarely addressed the issue in the context of harassment or abuse, the Court appears to distinguish between repeated unwanted one-to-one speech to a target, which the government may generally prohibit, and one-to-many speech about a target, which the government generally may not prohibit. Eugene Volokh, *One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking"*, 107 Nw. U. L. Rev. 731 (2013); *see also*, Aaron H. Caplan, *Free Speech and Civil Harassment Orders*, 64 Hastings L.J. 781, 842 (2013) (arguing that "[a] proper civil harassment petition may bar contact between a respondent and a petitioner, but must not hinder the respondent's ability to speak to others--even in ways that the petitioner may

dislike"). The state court's conclusion—that Petitioner's criminal punishment for violating the protection from abuse order did not offend his free speech rights—is in accord with this distinction as far as the protection from abuse order and Petitioner's conviction are based on Petitioner's many communications directed specifically to or at an unwilling recipient. Accordingly, the state court decision regarding Petitioner's free speech rights was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.[12]

### 2. Right to Petition

The relevant portion of the First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the government from "abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. "The right of access to the courts is . . . one aspect of the right of petition." *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). In several contexts, the Supreme Court has held that "[t]hose who petition government for redress are generally immune from . . . liability." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) (discussing protection against antitrust actions and mentioning labor relations actions); *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (discussing RICO liability and explaining that "those who petition any department of the

---

[12] Petitioner's free speech challenge based on his criminal prosecution for publishing an ad in a local newspaper which was only indirectly about Burch and was distributed to the general public might require a different analysis. An examination of the dates alleged in the charges against Petitioner an dates covered by the counts on which Petitioner was convicted, however, reveals that Petitioner was not convicted based on the newspaper ad and thus that argument is not grounds for habeas relief.

government for redress are generally immune from statutory liability for their petitioning conduct"). The Supreme Court, however, has distinguished between "genuine petitioning," which is generally protected, and "sham petitioning" which is not. *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525–26, 122 S. Ct. 2390, 2396, 153 L. Ed. 2d 499 (2002); *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) ("baseless litigation is not immunized by the First Amendment right to petition").

Courts also have authority to restrict parties' communications in the course of litigation and, in some circumstances, prospectively prevent them from filing suits without permission of the court. *See Martin v. D.C. Court of Appeals*, 506 U.S. 1, 3–4 (1992) (courts may enjoin further court filings after repetitious and frivolous requests); *Tripati v. Beaman*, 878 F.2d 351, 352 (10th Cir. 1989) ("A district court has power . . . to enjoin litigants who abuse the court system by harassing their opponents") *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005) (same); *United States v. Coleman*, 707 F. App'x 563 (10th Cir. 2017) ("Filing restrictions are proper where a litigant's abusive and lengthy history is properly set forth, the court provides guidelines as to what the litigant must do to obtain the court's permission to file an action, and the litigant receives notice and an opportunity to oppose the court's order before it is instituted") (internal quotations omitted). The First Circuit has recognized that "courts plainly possess discretionary powers to regulate the conduct of abusive litigants," but "the restrictions imposed must be tailored to the specific circumstances presented," and the offending party should be given "adequate notice" and "an opportunity . . . to oppose . . . an order placing restrictions on court access." *Cok v. Family Court of Rhode Island*, 985 F.2d 32, 34 (1st Cir. 1993).

One charge on which Petitioner was convicted involved copies of documents that Petitioner sent to Burch after filing them in state court. Providing the documents to Burch was arguably required by court rules. Petitioner was on notice that he could not harass or contact Burch except for a narrow category of communications related to [C.B.] and the parental rights and responsibilities arrangement. Nevertheless, in his court filings, he made baseless demands and claims for relief that could reasonably be construed as an attempt to intimidate or harass Burch and that extend well beyond anything that was necessary to assert any legal claims he might have against Burch. A party cannot use the cover of litigation to engage in conduct that is otherwise prohibited by law or by a court order because it would not be protected as it would constitute "sham petitioning." That is, the mere fact that the court rules require a party to serve pleadings upon an opposing party does not give the party license to file a baseless lawsuit and contact and communicate with the opposing party in violation of the terms of a protective order. While the statute as applied in certain circumstances could conceivably generate some constitutional concerns, the concerns are not generated under the facts of this case. *See also*, *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984) ("the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge"). Petitioner, therefore, has not established that the state court decision was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

**C.	Due Process Claims**

**1.	Vagueness**

The due process clauses of the Fifth and Fourteenth Amendments "guarantee [ ] that ordinary people have fair notice of the conduct a statute proscribes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (internal quotation marks omitted). The void-for-vagueness "doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Id.* "[W]e can never expect mathematical certainty from our language," but the law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

Courts have reached different conclusions as to the vagueness of civil and criminal harassment laws and orders. *See generally*, Caplan, *Free Speech and Civil Harassment Orders*, 64 Hastings L.J. at 810–17 (2013). Some courts have struck down state harassment and stalking statutes with words like "harass" and "annoy" and utilizing a subjective standard based on the response of the target, while other courts have upheld harassment and stalking statutes that specifically define the prohibited conduct without reference to expressive content or that have used an objective reasonable person standard to define the offending conduct and content. *Id.*; *see generally*, *People By & Through City of Longmont v. Gomez*, 843 P.2d 1321, 1326 (Colo. 1993) (striking down harassment law with a specific intent requirement but containing poorly defined terms like harass, threaten, or abuse); *Galloway v. State*, 365 Md. 599, 619–39, 781 A.2d 851, 863–74 (2001) (summarizing state and federal cases and choosing to narrow construction of its own state statute to an

objective reasonable person standard to mitigate vagueness problems). The Supreme Court, however, has not addressed the issue. In the absence of any Supreme Court authority, fairminded jurists can disagree about the vagueness of Maine's protection from abuse, harassment, and stalking statutes and the vagueness of the terms of the protection from abuse order issued against Petitioner. Accordingly, the state court decision was not contrary to or an unreasonable application of the Supreme Court's void-for-vagueness precedent.

### 2.    Jury Instructions

Petitioner argues that the trial court should have instructed the jury on certain First Amendment concepts and should have been instructed on the definition of "abuse" in the statute. The state court supportably concluded that the First Amendment instructions that Petitioner proposed did not accurately state the law. Furthermore, while the definition of abuse is relevant to Petitioner's vagueness claim, Petitioner does not provide any authority to support an argument that the failure to instruct on all statutory definitions creates an independent due process claim. The state court's rejection of Petitioner's claims regarding the jury instructions, therefore, was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

### 3.    Jurisdiction

Petitioner argues the state courts lacked jurisdiction over him. The "structures and limitations of federalism" under the Constitution "allow[s] the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotation

marks omitted).  Petitioner has not established any defects in the state court's subject matter or personal jurisdiction.[13]

CONCLUSION

Based on the foregoing analysis, an evidentiary hearing is not warranted under Rule 8 of the Rules Governing Section 2254 Cases.  I recommend the Court dismiss Petitioner's petition for habeas relief under 28 U.S.C. § 2254, and that the Court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2254 Cases because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

**NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 18th day of March, 2020.

---

[13] The State argues that Petitioner has not exhausted his state remedies with respect to this claim because he did not present it on direct appeal and because he did not seek discretionary review with the Law Court of the state postconviction courts' rejection of the argument.  *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (to properly exhaust "the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim").  However, the Court does not need to treat Petitioner's filings as a mixed petition because the unexhausted claim clearly lacks merit.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").